[Civ. No. 36878. Second Dist., Div. Five. Apr. 13, 1971.]

BRYAN W. STEVENS et al., Plaintiffs and Appellants, v.
PHILIP E. WATSON, as Assessor, etc., Defendant and Respondent.

## COUNSEL

Malcolm H. Mackey and Stanley Sapiro for Plaintiffs and Appellants.

John D. Maharg, County Counsel, and DeWitt W. Clinton, Deputy County Counsel, for Defendant and Respondent.

## Opinion

## FRAMPTON, J.*—

### Statement of the Case

Appellants bring this action as taxpayers challenging the constitutionality of section 2.6 of article XIII of the California Constitution relating to the property taxation of nonprofit golf courses. Respondent's demurrer to appellants' petition for mandate and declaratory relief against Philip E. Watson as the assessor of Los Angeles County was sustained without leave to amend. Appellants stated for the record that they did not wish to amend, and have appealed from the judgment (order of dismissal).

Section 2.6 of article XIII, added to the California Constitution in 1960 provides: "In assessing real property consisting of one parcel of 10 acres or more and used exclusively for nonprofit golf course purposes for at least two successive years prior to the assessment, the assessor shall consider no factors other than those relative to such use. He may, however, take into consideration the existence of any mines, minerals and quarries in the property, including, but not limited to oil, gas and other hydrocarbon substances."

The only question presented by this appeal is whether the foregoing provision of the California Constitution is repugnant to the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

### Statement of Facts

The facts are those set forth in the petition for writ of mandate and for declaratory relief.

The petition alleges that appellants are residents, citizens and owners of real property in the County of Los Angeles, and as such are taxpayers of such county. They bring the action on their own behalf and on behalf of all other property owners in the county who are not members of nonprofit golf courses. In the second count of the petition it is alleged that appellants Sapiro are of Jewish extraction and are, therefore, not eligible for membership in the majority of nonprofit golf clubs, and are only racially eligible for membership in certain purportedly separate but equal nonprofit golf courses where those of non-Jewish extraction are either prohibited or are very limited as to membership. Joined as "Doe" respondents, but never

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

served, are the nonprofit golf clubs in the County of Los Angeles eligible for assessment under section 2.6 of article XIII.

 The petition alleges further that section 2.6 offends the Fourteenth Amendment to the United States Constitution because (1) the "tax exemption is discriminatory against new golf courses, in that they would have to pay a very much higher tax for 'at least two years' than existing golf courses"; (2) it is discriminatory "as applied to golf courses under ten acres including pitch-and-put-courses"; (3) that in giving favored tax treatment to organizations which discriminate in admissions to membership on grounds of race, religion, national origin, occupation, income and social graces of applicants, the adoption of the measure constitutes "illegal state action" by California in violation of the Fourteenth Amendment; (4) the tax exemption is discriminatory as not being applicable to public golf courses operated for a profit; and (5) that the measure is unconstitutionally vague in that "it does not define what 'factors' can be utilized by assessors in assessing golf courses, and it is impossible to reasonably determine what factors are 'relative to such use.' "

*Power of State to Grant Tax Exemptions*

 The power of the state to select the subjects of taxation or to grant exemptions therefrom is very broad and a legislative determination in this field must be sustained if there is any conceivable state of facts which would support it.

"It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. [Citations.] This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption infringe no constitutional limitation. [Citations.]

"Like considerations govern exemptions from the operation of a tax imposed on the members of a class. A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it. [Citations.]

"This restriction upon the judicial function, in passing on the constitutionality of statutes, is not artificial or irrational. A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws.

In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." (*Carmichael* v. *Southern Coal & Coke Co.,* 301 U.S. 495, 509-510 [81 L.Ed. 1245, 1253, 57 S.Ct. 868, 109 A.L.R. 1327].)

The Supreme Court has recognized the power of legislatures in the regulation of economic and business affairs and has shielded them against attacks under the due process and equal protection clauses. (Cf. *McGowan* v. *Maryland* (1961) 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101] (classification in Sunday closing law exemption proper if any conceivable facts could justify them); *Railway Express Agency* v. *New York* (1949) 336 U.S. 106, 109-110 [93 L.Ed. 533, 538-539, 69 S.Ct. 463] (legislation need not reach every class to which it may have been applied, validating distinction between advertising on vehicles which is not related to the business in which vehicle is engaged, and advertising business in which vehicle is engaged); *Williamson* v. *Lee Optical of Oklahoma* (1955) 348 U.S. 483, 488-489 [99 L.Ed. 563, 572-573, 75 S.Ct. 461] (validating distinction between types of eyeglass sellers, and stating "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. . . . 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' "); *Tigner* v. *Texas* (1940) 310 U.S. 141, 149 [84 L.Ed. 1124, 1129, 60 S.Ct. 879, 130 A.L.R. 1321] (sustaining distinction between agricultural and other economic pursuits in the application of criminal portion of state anti-trust laws).

The Supreme Court of California has sustained legislation if any conceivable state of facts would support classifications contained therein. In *Franklin Life Ins. Co.* v. *State Board of Equalization* (1965) 63 Cal.2d 222 [45 Cal.Rptr. 869, 404 P.2d 477], upholding the law imposing a retaliatory tax on foreign insurance companies doing business in California, the court stated (pp. 232-233) relying on *Carmichael* v. *Southern Coal, supra,* "The United States Supreme Court, however, has long recognized the elementary principle that a distinction in tax statutes between parties does not violate the equal protection clause if such distinction rests upon a rational basis. That court has said, 'Neither due process nor equal protection imposes upon a state any rigid rule of the equality of taxation. . . . A legislature is not bound to tax every member of a class or

none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it.' " (See also *Bilyeu* v. *State Employees' Retirement System,* 58 Cal.2d 618, 623 [24 Cal.Rptr. 562, 375 P.2d 442]; *Werner* v. *Southern Cal. etc. Newspapers,* 35 Cal.2d 121, 129 et seq. [216 P.2d 825, 13 A.L.R.2d 252].)

■ We are of the opinion that section 2.6 conforms to the requirements of equal protection under the foregoing principles because there are a number of conceivable states of fact that provide rational support for its provisions. Section 2.6 fits into an overall scheme in which the state's power to tax is directed toward discouraging premature development of urban and near urban land and toward encouraging the preservation of open spaces. (Cf. Ehrman & Flavin, Taxing California Property (1967 ed.) § 413, p. 383.) Further illustrative of this policy is section 1 of article XXVIII of the California Constitution, adopted November 8, 1966: "The people hereby declare that it is in the best interest of the state to maintain, preserve, conserve and otherwise continue in existence open space lands for the production of food and fiber and to assure the use and enjoyment of natural resources and scenic beauty for the economic and social well-being of the state and its citizens. The people further declare that assessment practices must be so designed as to permit the continued availability of open space lands for these purposes, and it is the intent of this article to so provide."

In addition to section 2.6 and the various statutes implementing article XXVIII, the foregoing scheme is manifest in the California Land Conservation Act (Gov. Code, § 51200 et seq.), in section 402.1, Revenue and Taxation Code, and in section 6950 et seq., Government Code. An order directing the assessor to ignore the provisions of section 2.6 would run counter to the foregoing policy of the state, and, for that reason, should not be granted. (Cf. *Plum* v. *City of Healdsburg,* 237 Cal.App.2d 308, 318-319 [46 Cal.Rptr. 827].)

The salient purpose of the measure was to encourage the continued operation of a certain class of golf course. The reasons why it was considered desirable to accomplish this purpose can be abstracted from the argument to voters as follows:

(1) The courses were considered beneficial because they provided "wooded, planted, open space areas giving greenbelt breathing space to California's growing cities."

(2) The continued operation of these courses, it was felt, would reduce the need for government to either take over such courses if they

ceased operation or in the alternative establish other courses. Either alternative, it was believed, would increase future taxes and governmental expenses.

(3) The continued operation of these courses, it was thought, would preserve the value of surrounding residential property and correspondingly protect that portion of the tax base.

(4) The courses, it was believed, were a tourist and convention attraction. Tourism is a valuable state asset which it was believed was important to foster.

(5) The discontinuance of these courses would add additional player load to the remaining courses.

(6) It was believed that the courses would provide needed mobilization areas in case of disaster, and that the planted areas of the courses would aid in decontamination of the air and assist in air pollution control.

(7) It was felt that the courses contributed to the beauty, health and appeal of our growing metropolitan areas.

Section 2.6 of article XIII provides that golf courses owned by nonprofit corporations, consisting of at least 10 acres, and having operated for two years, are entitled to special property tax treatment. This class of golf courses is treated differently for property tax purposes from other golf courses which do not meet the required specifications. We are of the opinion that such special tax treatment is a proper and reasonable classification. Each of the three factors (nonprofit, 10 acres, and two years) is reasonable in relation to the purposes of the law. The people could well have believed that nonprofit golf courses faced greater financial difficulties to survive, were more likely to be converted to other uses than courses operated for profit, and for this reason were in need of special tax assistance to encourage their continued operation. The people could well have believed that only a course containing at least 10 acres would be most suitable in furthering the purposes of the section such as the preservation of greenbelt areas and assistance in reducing air pollution. The people could very well have imposed the two-year restriction in the belief that such restriction would assure that each such golf course has demonstrated a degree of permanence and that such restriction would tend to discourage the use of the section as a temporary tax advantage.

While the language of section 2.6, as it relates to the grant of special tax treatment to golf courses of the class here under consideration, is not vague or uncertain, we find no impropriety in resorting to the ballot arguments presented to the electorate in support of its adoption to ascer-

tain whether a "conceivable state of facts" is present to support the legislative classification. (Cf. *Carter* v. *Com. on Qualifications, etc.,* 14 Cal.2d 179, 185-186 [93 P.2d 140]; *Ducey* v. *Dambacher,* 27 Cal.App.2d 658, 661-662 [81 P.2d 597].)

We are of the opinion that the ballot arguments disclose a "conceivable state of facts" to support the legislative classification, and, accordingly establish that there is no denial of equal protection.

Appellants urge that "The state became significantly involved in private discrimination by the enactment of section 2.6." They cite and rely on *Reitman* v. *Mulkey,* 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], in support of this argument. (See also *Mulkey* v. *Reitman,* 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], affirmed in *Reitman* v. *Mulkey, supra.*)

*Mulkey* involved a direct attack by a prospective lessee on the racial discrimination of a property owner in refusing to lease his real property under the provisions of a constitutional amendment commonly referred to as Proposition 14, wherein a property owner was given "absolute discretion" to choose the person with whom he would deal in the sale or lease of his real property. The United States Supreme Court, as well as the California Supreme Court, struck down the constitutional amendment (art. I, § 26) on the grounds that it constituted an extension of prohibited state action, and that California was jointly responsible for that conduct because in adopting Proposition 14, the state authorized and encouraged racial discrimination, made possible discrimination that, prior to its adoption, was illegal, and established a purported constitutional right to privately discriminate on grounds which admittedly would be unavailable under the Fourteenth Amendment should state action be involved. We do not believe that the rule laid down in *Mulkey* is decisive of the question presented here. It was stated in *Mulkey* v. *Reitman* that:

"The parties generally concede that in an organized and regulated society the state or its subdivisions play some part in most, if not all, so-called private transactions, and it must be acknowledged, without specifically enumerating them, that many of the rights and duties arising out of the transfer of an interest in real property are related to or dependent upon the state or local governments. But it is not the mere fact that in some manner the state is involved, however remotely, with which we are concerned. It is only where the state is significantly involved that the prohibitions of the equal protection clause are invoked. The Supreme Court in *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, stated the proposition in the following language at page 722 [6 L.Ed.2d 45 at p. 50, 81 S.Ct. 856]: '. . . private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some

significant extent the State in any of its manifestations has been found to have been involved in it.' That proscribed state involvement is not to be limited to direct conduct on the part of its employees, agents and representatives is made apparent by the court's further statement at page 722: 'Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance.' More recently the Supreme Court has stated: 'Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.' [Citation.]

"However subtle may be the state conduct which is deemed 'significant,' it must nevertheless constitute action rather than inaction. The equal protection clause and, in fact, the whole of the Fourteenth Amendment, is prohibitory in nature and we are not prepared to hold, as has been urged, that it has been or should be construed to impose upon the state an obligation to take positive action in an area where it is not otherwise committed to act. Urged in support of such propositions is *James* v. *Marinship Corporation*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. But the prior state commitment in that case is clear. We held that a so-called private labor union could not racially discriminate against those who wished to become members, but we first concluded that the union, because it had obtained a monopoly on the labor supply, was like a public service business which, under the law of the state, was precluded from discriminating on the basis of race. Likewise, in *Jackson* v. *Pasadena City School Dist.*, *supra*, 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878], the state, because it had undertaken through school districts to provide educational facilities to the youth of the state, was required to do so in a manner which avoided segregation and unreasonable racial imbalance in its schools.

"The problem thus becomes one of ascertaining positive state action of a degree sufficient to be deemed significant in the accomplishment of the recognized and admitted discrimination." (64 Cal.2d 529, 536-537.)

The provisions of section 2.6 are neutral with respect to the manner in which certain property is to be assessed for tax purposes. The section makes no distinction based upon what class of persons or entities own the property, or whether the property is or is not open to the public, or on the basis of any conduct of any kind of the owners or occupants. If the property qualifies under section 2.6, the owner is entitled to its benefits without regard to race, color, creed, or national origin. The Fourteenth Amendment proscribes conduct of the state or conduct for which the state can fairly be held responsible. It protects the individual against state action and not

against wrongs done by individuals. (*United States* v. *Guest* (1966) 383 U.S. 745, 755 [16 L.Ed.2d 239, 247-248, 86 S.Ct. 1170].) ■ As was said in *Bell* v. *Maryland,* 378 U.S. 226, 313 [12 L.Ed.2d 822, 848, 84 S.Ct. 1814]: "Prejudice and bigotry in any form are regrettable, but it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of personal prejudices including race. These and other rights pertaining to privacy and private association are themselves constitutionally protected liberties.

"We deal here, however, with a claim of equal access to public accommodations. This is not a claim which significantly impinges upon personal associational interest; nor is it a claim infringing upon the control of private property not dedicated to public use." (Concurring opinion by Mr. Justice Goldberg.) Unlike the claim in *Bell,* the claim here does impinge upon personal associational interests and does seek to abridge the constitutional right of every person to close his club to any person.

The high standards of conduct imposed upon the states by the Fourteenth Amendment are applicable to nominally private activities where the state had delegated to private groups extraordinary powers to perform functions bearing a close relationship to sovereignty, such as the combination of electoral officials and "private political parties" whose function was the systematic exclusion of Negroes from participation in the only meaningful elections in certain southern states, as in *Terry* v. *Adams* (1953) 345 U.S. 461 [97 L.Ed. 1152, 73 S.Ct. 809]; or the criminal prosecution of a citizen for attempting to express her religious views on a sidewalk open to the public at the instance of a "private" corporation whose authorized function and powers were the same as given by the state to all municipalities, as in *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]; or the conduct of "private" institutions in excluding Negroes from access to services intended for the public generally on government owned property and with substantial participation of the government, financial and otherwise, such as was involved in *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856], and *Evans* v. *Newton* (1966) 382 U.S. 296 [15 L.Ed.2d 373, 86 S.Ct. 486]; or the criminal prosecution of Negroes excluded from places of public accommodations in localities where the state either required such exclusion by law, as in *Peterson* v. *Greenville* (1963) 373 U.S. 244 [10 L.Ed.2d 323, 83 S.Ct. 1119]; or imposed an additional burden by law on those who did not wish to discriminate, as in *Robinson* v. *Florida* (1964) 378 U.S. 153 [12 L.Ed.2d 771, 84 S.Ct. 1693]; or the conduct by the state, either through zoning ordinance, as in *Buchanan* v. *Warley* (1917) 245 U.S. 60 [62 L.Ed. 149, 38 S.Ct. 16], or by court compulsion, as in

*Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441], to prohibit willing sellers and buyers from transferring residential property situated in white neighborhoods.

None of the foregoing standards of conduct has any application to the conduct of private clubs in selecting their membership nor to section 2.6, representing a broad, neutral state policy of conservation of property used for golf courses. ■ It cannot be said that the operation and management of these private golf courses is in any sense connected with a governmental function. California does not participate in any way in such operation or management, and cannot fairly be charged with any responsibility for the private conduct of the owners of such golf courses. Since section 2.6 is in furtherance of a proper public purpose and tends to promote the general welfare, the fact that it may incidentally benefit some person who may practice discrimination is immaterial. Any serious argument to the contrary is answered by the decision in *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 672-675 [25 L.Ed.2d 697, 703-705, 90 S.Ct. 1409], where the United States Supreme Court stated:

"The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that fosters its 'moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing the influences in community life and finds this classification useful, desirable, and in the public interest. Qualification for tax exemption is not perpetual or immutable; some tax exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption.

". . . . . . . . . . . . . . . .

"The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into

arms of the state or put employees 'on the public payroll.' There is no genuine nexus between tax exemption and establishment of religion. . . ."

In a concurring opinion, Mr. Justice Brennan stated (397 U.S. at p. 689 [25 L.Ed.2d at p. 713]): "[G]overnment grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities. Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society."

Since a tax exemption does not sufficiently involve the state in the religious activities of the beneficiary of such an exemption to constitute a violation of the specific prohibitions of the First Amendment, it follows that a tax exemption such as the one here under consideration does not involve the state in the private conduct of the property owner benefited by such exemption under the more general proscription of the equal protection clause.

Appellants urge that that portion of section 2.6 which grants the tax exemption to those golf courses which have been established and which have been operating for at least two successive years prior to the assessment is sufficient alone to render the entire section unconstitutional, citing and relying on *Mayflower Farms* v. *Ten Eyck* (1936) 297 U.S. 266, 273-274 [80 L.Ed. 675, 679, 56 S.Ct. 457]; *Accounting Corp.* v. *St. Bd. of Accountancy* (1949) 34 Cal.2d 186, 190 [208 P.2d 984]; *In re Fassett,* 21 Cal. App.2d 557, 560-561 [69 P.2d 865]; and *Soares* v. *City of Santa Maria,* 38 Cal.App.2d 215, 217-218 [100 P.2d 1108].

In *Mayflower Farms* it was held that a provision of a state milk control law denying to persons embarking in the business of milk dealer after the date when the act took effect the benefit of a differential in the minimum price at which dealers may sell milk to stores, and stores may sell to consumers, in favor of milk dealers not having a well advertised tradename, denies the equal protection of the laws where not shown to have any relation to public health or welfare, or to operate to discourage monopoly, or to be aimed at any abuse cognizable by law in the milk business.

In *Accounting Corporation* the Supreme Court held that the proviso to Business and Professions Code section 5062, exempting from the licensing requirements for public accountants all domestic corporations which were engaged in the practice of accounting for three years prior to the effective date of the statute, and excluding all other corporations from such practice, is unreasonable and arbitrary since the competence of a public accounting

corporation depends, not on the length of time the corporation has been engaged in the practice of accounting, but on the experience, training and integrity of its personnel at the moment.

In *Soares* the court held a city ordinance discriminatory which provided for a license fee of $20 per quarter for a solicitor who has been in business at least one year, but five times that amount for one who has been in business for less than that time. The court, quoting from *In re Fasset,* 21 Cal.App.2d 557 [69 P.2d 865], said in part: " 'We are unable to see any natural, intrinsic or reasonable distinction between persons who have been engaged in that business at a particular location for a period of one year and others who have been thus established for a shorter period of time, perhaps only for eleven months and twenty-nine days. . . .'" (*Soares* v. *City of Santa Maria, supra,* 38 Cal.App.2d 215, 217-218.)

We do not believe the foregoing authorities are controlling where, as here, the sovereign has undertaken to grant a partial tax exemption on real property used exclusively for nonprofit golf course purposes for at least two successive years prior to the assessment, where it was conceivable that such restriction would assure a degree of permanence of such courses and would tend to discourage the use of the section as temporary tax advantage. As was said in *Williamson* v. *Lee Optical of Oklahoma* (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 572, 75 S.Ct. 461], if such legislation prove "unwise, improvident, or out of harmony with a particular school of thought," the remedy lies with the electorate at the polls, and not with the courts. There is also a serious question as to whether appellants have status to challenge the section on this ground, inasmuch as they have not shown that they are members of the class discriminated against. (Cf. *In re Willing,* 12 Cal.2d 591, 597-598 [86 P.2d 663]; *Ray* v. *Parker,* 15 Cal.2d 275, 283 [101 P.2d 665]; *DuBois* v. *Land,* 212 Cal.App.2d 563, 567 [28 Cal.Rptr. 167].)

### *Claimed Vagueness of Section 2.6*

Appellants urge that section 2.6 of article XIII is unconstitutional because it is vague, ambiguous and unintelligible.

A state constitutional provision or statute must be definite and its meaning ascertainable by those whose rights and duties it affects. (*Perez* v. *Sharp,* 32 Cal.2d 711, 728 [198 P.2d 17]; 3 Witkin, Summary of Cal. Law (1960), Constitutional Law, § 38, pp. 1827-1828.) Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language. (*American Civil Liberties Union* v. *Board of Education,* 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4].)

The following provisions of various statutory enactments have been held to be sufficiently clear so as to avoid the constitutional disability of vagueness: ". . . make diligent effort to find the owner." (*Pacific Coast Dairy* v. *Police Court,* 214 Cal. 668, 672, 677 [8 P.2d 140, 80 A.L.R. 1217]); "unreasonable waste of natural gas" (*People* v. *Associated Oil Co.,* 211 Cal. 93, 107-108 [294 P. 717]); "unsafe and unreasonable rate of speed" (*Ex parte Daniels,* 183 Cal. 636, 643 [192 P. 442, 21 A.L.R. 1172]); " *'unjustifiable* physical pain or mental suffering' " (*People* v. *Curtiss,* 116 Cal.App.Supp. 771, 775 [300 P. 801]); " 'without due caution and circumspection' " (*People* v. *Crossan,* 87 Cal.App. 5, 8 [261 P. 531]); " 'a wilful or a wanton disregard for the safety of persons' " (*People* v. *Smith,* 36 Cal.App.2d Supp. 748, 749-750 [92 P.2d 1039]); " 'imminent danger of *becoming addicted*' " (*People* v. *Victor,* 62 Cal.2d 280, 300 [42 Cal. Rptr. 199, 398 P.2d 391]); " 'questionable financial responsibility' " used as a basis for revocation of dry cleaner's license (*Duskin* v. *State Board of Dry Cleaners,* 58 Cal.2d 155, 159-160 [23 Cal.Rptr. 404, 373 P.2d 468]); the terms "oil pool" and "oil field" used in connection with regulation of drilling activities (*Wotton* v. *Bush,* 41 Cal.2d 460, 464-465 [261 P.2d 256]); and " 'will insure consumers a sufficient quantity of pure and wholesome milk' " (*Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 656 [91 P.2d 577]).

██ The assessor, under the provisions of section 2.6, in assessing property consisting of one parcel of 10 acres or more and used exclusively for nonprofit golf course purposes, is directed to consider no factors other than those relative to such use, except that he may take into consideration the existence of mines, minerals and quarries in the property. This constitutes a short and reasonably clear statement of an appraisal standard which directs the assessor not to consider such factors as potential useability of the property for industrial, commercial or residential purposes. Such standard, we believe, is sufficiently definite to provide a guideline for the conduct of the assessor in appraising the value of the property for tax purposes. (Cf. *Duskin* v. *State Board of Dry Cleaners,* 58 Cal.2d 155, 160 [23 Cal.Rptr. 404, 373 P.2d 468].)

The judgment is affirmed.

Kaus, P. J., and Aiso, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 9, 1971. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.