[Civ. No. 21260. Third Dist. July 24, 1984.]

CAPITOL RECORDS, INC., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

COUNSEL

Donovan, Leisure, Newton & Irvine, Hunton & Williams, Baity & Joseph, John Cooley Baity, Theodore S. Hope, Jr., Richard H. Sayler, Edward L. Marx and Lloyd C. Blankfein for Plaintiff and Appellant.

Irell & Manella, Kenneth I. Sidle and Lawrence E. Goldenhersh as Amici Curiae on behalf of Plaintiff and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, and Edward P. Hollingshead, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**SIMS, J.**—In this case, we hold, among other things, that the State Board of Equalization (Board) properly imposed use tax on plaintiff's acquisition of master sound tapes, made by independent producers and used in the production of phonograph records, even though the Board did not impose tax on the acquisition by major movie studios of movies made by independent film producers and also useful in the production of phonograph records.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Capitol Records Inc. (Capitol) appeals from a portion of a judgment entered after the court found the Board properly collected sales and

use taxes on Capitol's acquisition and licensing of master tapes used to produce phonograph records.

Capitol (which maintains its principal place of business in Hollywood, California) is a full line record company which produces, manufactures, promotes and distributes records, record albums, and prerecorded cassette, eight-track, and reel-to-reel tapes.

The master tapes at issue here are the prototypes from which record companies, such as Capitol, manufacture their products. They are made by editing and "mixing down" multiple-track tape recordings of sounds generated by instruments, singers and/or speakers at studio recording sessions. For record production, the master tape is used to cut a "lacquer master" from which a "stamper" for use in compression molding machines is ultimately derived. Cassette and eight-track prerecorded tapes are made from a "duplicating master," which in turn is made from the master tape.

Original master tapes are acquired by Capitol in one of three ways: (1) Capitol hires the exclusive services of artists (via a contract denoted "type A" in this litigation), conducts recording sessions at its facilities, and makes its own master tapes; (2) Capitol purchases (via a "type B" contract) master tapes made by others before any copies or lacquer masters are made; and (3) Capitol finances costs of independent production companies (with whom artists have exclusive contracts) and pays royalties in exchange for ownership of master tapes produced by these independent companies (a "type C" contract).[1]

Capitol also engages in transactions involving duplicate master tapes or "copy tapes." Capitol sometimes agrees to license another company to manufacture, promote, and distribute records and/or tapes owned by Capitol. Pursuant to the license agreement, Capitol makes a duplicate master tape for the licensee. Duplicate master tapes are sometimes transferred to Capitol from other companies pursuant to similar licensing agreements.

At issue in this suit are use taxes assessed on amounts paid by Capitol to acquire original master tapes made outside the state in connection with "type B" and "type C" contracts for accounting periods in 1968, 1969,

---

[1] Artists involved in these contracts include "Grand Funk Railroad" and "The Band."

1970, and 1971.[2] (There is no issue as to "type A" contracts.) Also at issue are use taxes imposed on amounts paid by Capitol for its acquisition of duplicate master tapes from other record companies, located out of state, and sales taxes imposed on amounts received by Capitol for furnishing duplicate master tapes to other companies, all pursuant to licensing agreements. Capitol paid the amounts assessed and claimed a refund from the Board. It brought suit when the Board denied its claim. (See Rev. & Tax Code, § 6933; all further statutory references are to the Revenue and Taxation Code unless otherwise indicated.)

DISCUSSION

I

A

We begin with a brief overview of the California use tax law and of principles applicable to suits by taxpayers seeking refunds.

Section 6201 defines the use tax and section 6202 specifies who pays it. Section 6201 provides in pertinent part: "An excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer on or after July 1, 1935, for storage, use or other consumption in this state . . . ." Section 6202 provides in relevant part:[3] "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this State . . . ."

Discussing the purpose of the use tax, this court has said that, "The Use Tax Law (§§ 6201-7273 et seq.) was designed to reach transactions involving property purchased from outside the state, not subject to California sales tax so that an unfair burden would not be placed upon local re-

---

[2]The parties stipulated that tax was imposed on transactions valued as follows:
"(1) $2,292,262 relates to Capitol's type B contracts.
"(2) $6,728,444 relates to Capitol's type C contracts.
"(3) $1,108,483 relates to Capitol's licenses from Electric & Music Industries, Limited.
"(4) $2,905,465 relates to Capitol's licenses from record companies other than Electric & Music Industries, Limited.
"(5) $2,065,000 relates to Capitol's licenses to record companies." Capitol asserts that a total of $863,363 in tax refunds and interest is at issue.

[3]The pertinent language of sections 6201 and 6202 was identical at the time of the transactions at issue here. (See Stats. 1967, ch. 963, §§ 5, 6, p. 2474; Stats. 1957, ch. 807, § 1, p. 2019.)

tailers engaged in intrastate commerce; . . . The Use Tax Law is complemental to the California Retail Sales Act of 1933 so that all taxable property is taxed once for the support of the state government." (*McConville* v. *State Bd. of Equalization* (1978) 85 Cal.App.3d 156, 159 [149 Cal.Rptr. 194], citations omitted; see *Burroughs Corp.* v. *State Bd. of Equalization* (1984) 153 Cal.App.3d 1152, 1159 [200 Cal.Rptr. 816]; Traynor, *The California Use Tax* (1936) 24 Cal.L.Rev. 175, 176.)

■ We also note that "In a suit for refund of tax, the burden of proof is on the taxpayer. (*Flying Tiger Line* v. *State Bd. of Equal.* (1958) 157 Cal.App.2d 85, 99 [320 P.2d 552].) . . . In an action for refund, 'the taxpayer has the burden of proof to show that he is entitled to his claim. He cannot assert error and thus shift to the state the burden to justify the tax. . . .' (*Hall* v. *Franchise Tax Board* (1966) 244 Cal.App.2d 843, 848 [53 Cal.Rptr. 597].)" (*Honeywell, Inc.* v. *State Bd. of Equalization* (1982) 128 Cal.App.3d 739, 744 [180 Cal.Rptr. 479]; see *Paine* v. *State Bd. of Equalization* (1982) 137 Cal.App.3d 438, 442 [187 Cal.Rptr. 47].)

### B

■ Capitol first contends the Legislature specifically provided a retroactive exemption from taxation for master tapes during the years in question when the Legislature amended section 6362.5 in 1982. (Stats. 1982, ch. 951, § 1, pp. 3442-3443.) In order to evaluate Capitol's argument, we review the history of section 6362.5.

In 1975, the Legislature enacted section 6362.5,[4] which exempted from tax the gross receipts received for the sale, lease, storage or use of master tapes or master records. (Stats. 1975, ch. 1116, § 1, p. 2708.) However, subdivision (a) of the statute provided that tax would continue to be due on

---

[4]As enacted in 1975, section 6362.5 provided as follows: "(a) There are exempted from the taxes imposed by this part the gross receipts from the sale or lease of, and the storage, use, or other consumption in this state of, master tapes or master records embodying sound, except amounts subject to the taxes imposed by other provisions of this part paid by a customer in connection with the customer's production of master tapes or master records to a recording studio for the tangible elements of such master records or master tapes.

"(b) For purposes of this section:

"(1) 'Master tapes or master records embodying sound' means tapes, records, and other devices utilized by the recording industry in making recordings embodying sound.

"(2) 'Amounts paid for the furnishing of the tangible elements' shall not include any amounts paid for the copyrightable, artistic or intangible elements of such master tapes or master records, whether designated as royalties or otherwise.

"(3) 'Recording studio' is a place where, by means of mechanical or electronic devices, voices, music, or other sounds are transmitted to tapes, records, or other devices capable of reproducing sound."

"amounts . . . paid by a customer in connection with the customer's production of master tapes or master records to a recording studio for the tangible elements of such master records or master tapes." (*Ibid.*) The 1975 enactment specifically provided, "The provisions of this act are not intended by the Legislature to support any inference about the meaning of the law prior to the operative date of this act." (*Ibid.*)

The parties agree that the enactment of section 6362.5 in 1975 gave Capitol what it seeks in this suit for years after 1975—an exemption from taxation on transfer of master tapes. The parties further agree that the 1975 legislation operates prospectively only and cannot be a basis of upholding Capitol's position in this case.

In 1982, the Legislature enacted Assembly Bill No. 2871. Section 1 of that act amended subdivision (b)(2) of section 6362.5 to add the following italicized language: "(2) 'Amounts paid for the furnishing of the tangible elements' shall not include any amounts paid for the copyrightable, artistic or intangible elements of such master tapes or master records, whether designated as royalties or otherwise *including, but not limited to, services rendered in producing, fabricating, processing, or imprinting tangible personal property or any other services or production expenses in connection therewith which may otherwise be construed as constituting 'sale' under Section 6006.*" (Stats. 1982, ch. 951, § 1, p. 3443.)

The 1982 amendment also included the following statement of legislative intent: "The Legislature finds and declares that Section 1 [quoted above] of this act is declaratory of, and not a change in, existing law. It is the intent of the Legislature in enacting this act to clarify the existing law and to affect all applicable pending proceedings." (Stats. 1982, ch. 951, § 2, p. 3443.)

Capitol contends the 1982 amendment reflects an expression of legislative intent to apply all of section 6362.5 (including the explicit exception afforded master tapes in subdivision (a)) retroactively to all "pending proceedings," including this case. We are unpersuaded.

We have examined certain materials submitted to us by the parties containing indications of the collegial intent of the Legislature in enacting the 1982 amendment. (See *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 222-223 [185 Cal.Rptr. 270, 649 P.2d 912].)[5] These

---

[5]We have not considered materials reflecting the views of any one legislator. (See *Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d at pp. 221-222 (conc. opn. of Mosk, J.).)

materials are the staff commentaries of the Assembly and Senate Committees on Revenue and Taxation[6] and the Legislative Counsel's Digest.[7]

These materials make it clear that the purpose of the 1982 amendment to section 6362.5 was to attempt to clarify whether fabrication costs of independent recording engineers and producers were subject to tax *under the 1975 statute. There was no intent to apply the 1975 legislation retroactively.* The amendment purports to reach back to 1975 and to affect claims subject to adjudication under the 1975 statute, but the amendment does not attempt to affect claims such as Capitol's that originated before 1975.[8]

---

[6]The background of Assembly Bill No. 2871, containing the 1982 amendment, is described in the staff commentary of the Assembly Revenue and Taxation Committee as follows: "The bill apparently is intended to resolve a dispute now underway between the State Board of Equalization and a number of independent recording engineers and producers over the recording industry's sales tax liability for master tapes and records. [¶] BOE is attempting to collect back taxes plus penalties and interest from certain producers for the portion of the sales price of the master tape or record that represents the 'fabrication' costs. The affected recording industry representatives believe this is a new interpretation which is *not consistent with the actual coverage of the law.* This bill is intended to clarify that the sales tax does not apply to those fabrication expenses associated with master tape and record production, and thereby to resolve the pending disputes in favor of the industry." (Staff Analysis, Assem. Bill No. 2871, Assem. Rev. & Tax. Com., Apr. 14, 1982, p. 2, italics added.) The staff report of the Senate Committee on Revenue and Taxation contains an almost identical statement of the purpose of the legislation. (See Staff Analysis, Assem. Bill No. 2871, Sen. Com. on Rev. & Tax, Apr. 21, 1982, pp. 734-735.)

[7]The Legislative Counsel's Digest of Assembly Bill No. 2871 reads in relevant part as follows: "*Existing law* exempts from sales and use taxes the gross receipts from the sale or lease of, and the storage, use, or other consumption of, master tapes or master records embodying sound, as defined, other than amounts subject to sales taxes paid by a customer in connection with the customer's production of master tapes or master records to a recording studio, as defined, for the tangible elements of those master records or master tapes. [¶] This bill would specify that *for the purposes of that law* amounts paid for the furnishing of the tangible elements also shall not include services rendered in producing, fabricating, processing, or imprinting tangible personal property or any other services or production expenses in connection therewith. *It would also make legislative findings* and declarations that those provisions are *declaratory of existing law.*" (Stats. 1982, ch. 951, p. 3442, italics added.)

[8]We are mindful of our prior remarks that, "The Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean." (*Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582], italics in original; see *County of Sacramento* v. *State of California* (1982) 134 Cal.App.3d 428, 433, fn. 5 [184 Cal.Rptr. 648] and authorities cited therein.) We recognize that "declaratory or defining statutes are to be upheld [only] as an exercise of the legislative power to enact a law for the future." (*Matter of Coburn* (1913) 165 Cal. 202, 210 [131 P. 352].) Our discussion of the 1982 amendment to section 6362.5 should not be construed as an endorsement of the declaration of legislative intent contained therein. Since we have concluded the Legislature did not intend to affect Capitol's dispute in this case by its enactment of the 1982 amendment, we have no occasion to consider what effect, if any, the amendment might have or to apply the rule of *Coburn* and its progeny.

## II

Having rejected any retroactive application of the statutory exemption, we now turn to Capitol's other arguments to the effect that no use tax can be imposed on its acquisition of original master tapes made outside the state during the 1968-1971 time period.

### A

■ Capitol first contends the trial court erred in finding that agreements between Capitol and independent production companies for acquisition of master tapes (type C contracts) were sales agreements and not employment contracts. Both sides agree that performance of services or production of goods by an employee for an employer does not result in the imposition of use tax. (See *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 386 [47 Cal.Rptr. 848].)[9] ■ In determining whether one who performs services for another is an employee or an inde-- pendent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. (*Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686]; *Automatic Canteen Co.* v. *State Board of Equalization, supra,* 238 Cal.App.2d at p. 386.) Whether the right to control existed or was exercised is generally a question of fact to be resolved from the reasonable inferences to be drawn from the circumstances shown. (*Miller* v. *Long Beach Oil Dev. Co.* (1959) 167 Cal.App.2d 546, 550 [334 P.2d 695].)

Capitol argues it exercised the same supervision and control over recording sessions of the artists employed by the production companies subject to type C contracts as it did with its direct employees under type A contracts.[10] In essence, Capitol asks us to reweigh conflicting evidence. This is a particularly inappropriate request since Capitol waived findings of fact by not requesting them.[11] ■ "Our role in the absence of findings is laid out in *Price* v. *Price* (1952) 114 Cal.App.2d 176, 179 [249 P.2d 841]: 'the ap-

---

[9]Although not articulated in *Automatic Canteen,* there is no use tax on goods produced by an employee for an employer because the goods have not been "purchased from any retailer" as required by section 6201.

[10]Since neither side has contended the parol evidence rule should bar extrinsic evidence of the meaning of Capitol's agreements, we do not consider the possible application of that rule. (See *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 338 [124 Cal.Rptr. 513, 540 P.2d 609]; cf. *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 23-24 [92 Cal.Rptr. 704, 480 Cal.Rptr. 320].)

[11]The case was tried in 1981 when rule 232 of the California Rules of Court allowed entry of findings of fact and conclusions of law. Effective January 1, 1982, rule 232 was amended to substitute a statement of decision for findings and conclusions.

pellate court will not weigh the evidence to determine what is true and what is not, but will assume that the trial court found every fact essential to support the judgment, and will search the record for the purpose only of determining whether there is substantial evidence supporting the judgment and will resolve all doubts in favor of the judgment. [Citation.]' (See also *Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 861 [137 Cal.Rptr. 528]; *Lane & Pyron, Inc.,* v. *Gibbs* (1968) 266 Cal.App.2d 61, 65 [71 Cal.Rptr. 817].)" (*Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 174 [159 Cal.Rptr. 864].)

■■■ We first note that the type C agreements themselves provide substantial evidence that no employee/employer relationship existed between Capitol and the makers of master tapes. Capitol's type C contracts consist of two separately signed agreements, one for production of master tapes and one for royalties. The royalty agreement describes the production contract as "an agreement (called the 'Contract') under which [the independent production] *Company will produce for its own account* phonograph record masters embodying performances by the individual(s) identified in Section 11 below (collectively called 'Artist') *and sell such masters to Capitol.*" (Italics added.) In the production agreement, the production company warrants, inter alia, "The Artist Recording Contract permits Company to sell masters recorded thereunder to Capitol on all the terms of Addendum No. 1 hereto;" and "Company has the right to make this entire agreement and . . . Company has not done or permitted to be done anything which may curtail or impair any of the rights given or grants made herein." Thus, on its face, the production agreement is a sales contract, not a contract of employment.

Trial testimony also established that, during the time period at issue, Capitol did not exercise de facto control over those making master tapes pursuant to type C contracts. For example, there was no requirement that selections or song titles be submitted to or approved by Capitol before recording sessions began. The sessions were directed by session producers usually chosen and supplied by the independent production company; they were usually not Capitol employees. Independent session producers hired musicians and vocalists, assisted in arranging music, directed performances in the studios, and worked with sound engineers in the mix-down process that resulted in the master tape. Other producers employed by Capitol scouted artists, found tunes that were prospective "hits," and did "a large amount of peripheral work" in connection with recording sessions. The Capitol producers participated in but did not dictate decisions regarding recording session dates and locations. Capitol's employees approved the budget submitted by the production company (to avoid overcharges) and paid the bills.

The inference to be drawn from this testimony is that it was the session producer, not Capitol, who controlled the manner and means of accomplishing the production of a master tape. Substantial evidence supports the trial court's determination that master tapes furnished to Capitol pursuant to type C contracts were purchased by Capitol from independent companies and were not fabricated for Capitol by its employees. (See *Mission Park Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 127 [100 Cal.Rptr. 69].)

B

Capitol next contends the Board acted unreasonably in imposing use tax on master tapes made outside the state and acquired by Capitol pursuant to type B and C contracts.

The parties disagree as to the legal authority that the Board relied on when it imposed tax. Prior to the 1970's, the Board adopted formal interpretive "rulings" which were published in the California Administrative Code.[12] These "rulings" or "rules" (which were generally readopted as "regulations" by the Board in the 1970's) were consistently treated by the courts as formal administrative interpretations of statutes entitled to great weight and subject to being overturned only if shown to be plainly arbitrary. (See, e.g., *Mission Pak Co.* v. *State Bd. of Equalization, supra,* 23 Cal.App.3d at p. 125; *Gen. Elec. Co.* v. *State Bd. of Equalization* (1952) 111 Cal.App.2d 180, 188 [244 Cal.Rptr. 427].)

In the instant case, the Board contends imposition of tax was based on formal Board ruling No. 16, applicable during the years in question and renumbered and adopted as Board regulation No. 1527 on December 3, 1971.[13]

---

[12]The Board's authority for adopting rules and regulations is section 7051 of the Revenue and Taxation Code, which provides in pertinent part: "The board shall enforce the provisions of this part and may prescribe, adopt, and enforce rules and regulations relating to the administration and enforcement of this part."

[13]During the years in question, until December 3, 1971, Board ruling No. 16, published in the California Administrative Code, provided as follows:

"(a) RECORDING STUDIOS

"Tax does not apply to the charges by a recording studio for the recording of a program on 'wax,' tape, or wire if the 'wax,' tape, or wire is not delivered to the customer, or to any person at the direction of the customer, and title is retained by the studio. If, however, the recording studio agrees to furnish finished records, acetates, or other tangible personal property which becomes the property of others, tax applies to the sale of such tangible personal property, without any deduction on account of the rental of the studio facilities, or other labor or service costs involved in the manufacture of such tangible personal property, even though such costs are itemized in the billing rendered to the customer.

"To the extent that the studio in making the recording rents tangible personal property to

Capitol contends that the Board did not rely on ruling No. 16 but rather relied on the Board's *interpretation* of ruling No. 16. Capitol notes that ruling No. 16 (later regulation No. 1527) does not expressly refer to master tapes, and Capitol points to 1974 and 1976 amendments to regulation No. 1527 that do explicitly refer to master tapes.[14] Thus, Capitol contends the Board merely interpreted its own rule or regulation in imposing tax and that the Board's interpretation is entitled to less weight on review than is a rule or regulation itself according to the doctrine of *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593]. There the court held that while the Board's *interpretation* of its own regulation is not entitled to a presumption that it is correct unless shown to be arbitrary, capricious, or without rational basis, the interpretation is still entitled to great weight. (*Culligan, supra,* at pp. 92-93.)

■ Even assuming arguendo that tax was imposed on Capitol as a consequence of the Board's litigating interpretation of ruling No. 16, when we apply the rule of *Culligan* we conclude the interpretation was reasonable because tax was required by the applicable use tax statutes.[15]

Section 6201 (see *ante,* p. 588) imposes a use tax if (a) tangible personal property is (b) purchased (c) from any retailer (d) for storage, use or other consumption in this state. In this case there is no dispute that the master tapes were, in fact, used by Capitol in this state. Moreover, we have already concluded that the master tapes were acquired by purchase and not as a consequence of fabrication by employees. Additionally, we note that, except for argument that master tapes were fabricated by employees, Capitol has

---

the customer, tax applies as set forth in regulation 1660.

"(b) PROCESSORS

"The furnishing of 'masters,' 'mothers,' 'stampers,' and finished records by a processor to a producer constitutes a sale of tangible personal property and tax applies thereto.

"(c) LIBRARY PRODUCERS

"Tax applies as explained in regulation 1660 to rentals of records and other tangible personal property by library producers."

Effective December 3, 1971, ruling No. 16 was adopted, with immaterial amendments, as Board regulation No. 1527. (See Cal. Admin. Code, tit. 18, § 1527.)

[14]An amendment to regulation No. 1527, effective December 22, 1974, added subdivision (a)(4) and provided in relevant part that "Tax applies to rentals or sales of master recordings or master tapes by producers or recording artists to studios or by studios to others in the same manner as it does to rentals or sales generally." (See Cal. Admin. Code, tit. 18, § 1527.) Subdivision (a)(4) was amended effective January 1, 1976, to provide in pertinent part that "Tax applies to the sale of master tapes or master recordings embodying sound." (*Ibid.*)

[15]"In sum," said the *Culligan* court, "our present task is to determine whether the Board in making the assessment in controversy has properly interpreted the relevant sections of the Sales and Use Tax law and the Board's own relevant regulations adopted pursuant to such law." (*Culligan, supra,* 17 Cal.3d at p. 93.)

not contended that the independent producers of the tapes were not retailers.[16] Consequently, Capitol has not met its burden of proving that it acquired master tapes from someone other than a retailer. (See *Hotel Del Coronado Corp.* v. *State Board of Equalization* (1971) 15 Cal.App.3d 612, 619-620 [92 Cal.Rptr. 456]; see also *Honeywell, Inc.* v. *State Bd. of Equalization, supra,* 128 Cal.App.3d at pp. 744-745.)

Finally, we conclude that original master tapes acquired by Capitol constitute "tangible personal property" subject to the use tax. Section 6016 defines "tangible personal property" for purposes of sales and use tax liability as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." In *Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900 [167 Cal.Rptr. 366, 615 P.2d 555], the Supreme Court construed section 6016 and related regulations of the Board so as to uphold the imposition of sales tax on a transfer of film negatives and master recordings used to make audiovisual training materials. Simplicity's argument was that transfer of the negatives and masters was not subject to sales tax because the purchaser's primary interest was not in the physical objects but rather in the right to exploit the intangible intellectual products they embodied. Concluding that "the film negatives and master recordings are analogous to printing plates," (p. 909) the court held the materials subject to tax as tangible property: "Though valued in part for their intellectual content, they also were physically useful in the manufacturing process. Their value as physical objects permitted measuring the tax on their sale by the price received for their entire worth. Finally, the present transfer was not incidental to any service and so was a sale of property for tax purposes." (P. 912.) *Simplicity Pattern* controls here. Master tapes obtained by Capitol were manifestly useful in the manufacturing process, were not furnished as incidents to any service, and were therefore properly taxed as tangible personal property.

Since master tapes acquired by Capitol from out-of-state producers met all criteria for imposition of use tax under section 6201, the Board acted properly and reasonably in construing the statute and Board ruling No. 16 so as to tax the transactions in question.

---

[16]Section 6015, subdivision (a) defines "retailer" to include "Every seller who makes any retail sale or sales of tangible personal property, . . ." Section 6019 provides that every individual, firm, etc. making more than two retail sales of tangible personal property during any 12-month period shall be considered a retailer. (See *Bank of America* v. *State Bd. of Equal.* (1962) 209 Cal.App.2d 780, 796-797 [26 Cal.Rptr. 348].) Capitol has not contended that any independent producer made less than two sales in any 12-month period.

## C

Capitol next asserts that imposition of use tax on its acquisition of original master tapes pursuant to type B and C contracts violated guarantees of equal protection of the laws[17] because allegedly identical transactions between independent film producers and motion picture studios are exempt from tax.

### 1

It is undisputed that, during the years in question, major movie studios acquired rights in films made by independent producers outside the state, that the films were made with a soundtrack and picture negative as physically separate elements, that the studios sometimes used the soundtrack portion of the films ultimately to make records,[18] and that the Board did not impose tax on the movie studios when they acquired rights in these films (including soundtracks).

Before addressing Capitol's equal protection claim, we examine the legal bases upon which the Board has exempted from tax the acquisition of movies by movie studios. In 1933, the Board adopted ruling No. 19, (now Cal. Admin. Code, tit. 18, § 1529) which, during the period in question here, read in relevant part as follows: "Producers of motion pictures are consumers of all film and other tangible personal property used in production, and tax applies to sales to producers of such property. *Tax does not apply to amounts received by the producer for the right to exhibit or reproduce motion pictures.*" (Italics added.) Ruling No. 19 was adopted to reflect the established historical fact that independent producers of movies did not *sell* their movies to studios; rather, the agreement between producer and studio was one that generally allowed the studio to *lease* the producer's movie for exhibition and distribution. Accordingly, ruling No. 19 exempted "amounts received by the producer for the right to exhibit or reproduce motion pictures" because the transfer of such rights involved neither a "sale" for purposes of the sales tax (see § 6051) nor a "purchase" for purposes of the use tax (see § 6201). In 1965, when the Legislature first included leases of

---

[17]Article I, section 7, subdivision (a), of the California Constitution provides in pertinent part: "A person may not be . . . denied equal protection of the laws . . . ." The Fourteenth Amendment to the federal Constitution provides in pertinent part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[18]On appeal, Capitol argues that its records compete directly with record albums made from film soundtracks by movie studios. This assertion is not supported by evidence produced in the trial court. Capitol requests that we take judicial notice of information allegedly taken from *Billboard* magazine indicating the ranking of sales of record albums for certain years. We decline the request. (See *San Luis Obispo Bay Properties, Inc.* v. *Pacific Gas & Elec. Co.* (1972) 28 Cal.App.3d 556, 563-564 [104 Cal.Rptr. 733].)

tangible personal property as sales or purchases for tax purposes, it specifically exempted leases of motion picture and television films and tapes from taxation. (§§ 6006, subd. (g)(1); 6010, subd. (e)(1).)[19] These statutes afford films (including their soundtracks) an exemption from sales and use tax in the prescribed circumstances.

We question whether Capitol has standing to pursue its equal protection claim in light of the statutory exemption provided for films. Capitol's equal protection attack is expressly aimed immediately at striking down ruling No. 16 (later regulation No. 1527). However, as we have just concluded in part II-B, use tax was properly imposed on Capitol under the applicable statute. (§ 6201.) Since exemption from tax on the acquisition of films has also been granted by statute (§ 6010, subd. (e)(1)), any equal protection infirmity in the Board's rules and regulations is immaterial if tax is properly assessed on Capitol under the statutory scheme. (See fn. 15, *ante*.)

However, Capitol has not claimed that any statute is unconstitutional either on its face or as applied to Capitol. (Compare, e.g., *Estate of Morrison* (1982) 130 Cal.App.3d 543, 546-548 [181 Cal.Rptr. 834]; *City of San Jose* v. *Donohoe* (1975) 51 Cal.App.3d 40, 45-48 [123 Cal.Rptr. 804].) While Capitol could, in another form of action, attempt to invalidate the statutory exemption provided for films (see, e.g., *Kay* v. *Pacific Tel. & Tel. Co.* (1978) 83 Cal.App.3d 814, 817 [148 Cal.Rptr. 213]; *Stevens* v. *Watson* (1971) 16 Cal.App.3d 629, 633 [94 Cal.Rptr. 190]), Capitol has made no such challenge to the exemption statutes here, nor would it have standing to do so in this action.[20] (See *Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 912.) ▪ While this court has the power to invalidate a statute on constitutional grounds (see *Barker Bros., Inc.* v. *Los Angeles* (1938) 10 Cal.2d 603, 609 [76 P.2d 97]), we may not rewrite a statute to grant an exemption from tax. (See *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 25 [64 Cal.Rptr. 409, 434 P.2d 961]; *Cypress Lawn C. Assn.* v. *San Francisco* (1931) 211 Cal. 387, 390 [295 P. 813].)

While we question Capitol's standing to pursue their articulated equal protection attack, we also note the Board has not challenged Capitol's standing and has addressed the merits of why different tax classifications for master sound tapes and movies should be upheld. Consequently, we assume

---

[19]See Statutes 1965, First Extraordinary Session 1965, chapter 2, sections 6-7, pages 5445-5446; *Culligan Water Conditioning* v. *State Bd. of Equalization, supra,* 17 Cal.3d at p. 97.

[20]Besides that, knocking out the exemption provided the film industry is the last thing Capitol wants from this litigation. That victory would entitle Capitol to report to their film neighbors in Hollywood: "The good news is we won. The bad news is you're taxed too."

arguendo that Capitol is attempting to invalidate the combination of statutes that impose use tax on master tapes but exempt movies, as the statutes are applied to Capitol; we further assume Capitol has standing. (See *Carmichael* v. *Southern Coal Co.* (1936) 301 U.S. 495, 510-512 [81 L.Ed. 1245, 1253-1255, [57 S.Ct. 868, 109 A.L.R. 1327].) Also, because we find the separate classification of master tapes and movies constitutional, we do not reach the question whether any unconstitutionality in the statutory scheme could be saved by severing the exemption statute. (See, e.g., *Carmichael, supra,* 301 U.S. at p. 513 [81 L.Ed. at p. 1255]; see also *Morey* v. *Doud* (1957) 354 U.S. 457, 469 [1 L.Ed.2d 1485, 1494, 77 S.Ct. 1344], overruled on other grounds in *New Orleans* v. *Dukes* (1976) 427 U.S. 297, 306 [49 L.Ed.2d 511, 518-519, 96 S.Ct. 2513].)

2

Capitol must prove the Legislature adopted an impermissibly discriminatory classification by taxing the purchase of master tapes under section 6201 and by exempting the leasing of movies in section 6010, subdivision (e)(1).

As was said in *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009 at pages 1016-1017 [106 Cal.Rptr. 867]: "We start with the proposition that the statute comes before us clothed with a presumption of constitutionality.

" '[T]he power of the states to make classifications of persons or property for the purpose of taxation is very broad. . . . If a classification of persons or occupations made for the purpose of imposing taxes is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation and otherwise, it will be deemed to be valid . . . .' (*Roth Drug, Inc.* v. *Johnson,* 13 Cal.App.2d 720, at p. 733 [57 P.2d 1022]; see also *Fox, etc. Corp.* v. *City of Bakersfield,* 36 Cal.2d 136 [222 P.2d 879]; *Garrett Corp.* v. *State Board of Equal.,* 189 Cal.App.2d 504 [11 Cal.Rptr. 421]; *Abrams* v. *San Francisco,* 48 Cal.App.2d 1 [119 P.2d 197].)

" 'Neither due process nor equal protection imposes upon a state any rigid rule of the equality of taxation. . . . A Legislature is not bound to tax every member of a class or none. It may make distinctions . . . having a rational basis, and . . . they must be presumed to rest on that basis if there is any conceivable state of facts which would support it.' (*Carmichael* v. *Southern Coal Co.,* 301 U.S. 495, at p. 509 [81 L.Ed. 1245, 1253, 57 S.Ct. 868, 109 A.L.R. 1327]; see also *Stevens* v. *Watson,* 16 Cal.App.3d 629 [94

Cal.Rptr. 190]; *People* v. *Herbert's of Los Angeles, Inc.*, 3 Cal.App.2d 482 [39 P.2d 829].)

" . . . . . . . . . . . . . . . . . . . . . . . . .

"The legislative determination as to what is a sufficient distinction to warrant a classification will not be overthrown unless it is palpably arbitrary. (*Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, 702 [151 P. 398]; *McGowan* v. *Maryland,* 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101]; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61 [55 L.Ed. 369, 31 S.Ct. 337.)"

■ In the instant case, Capitol has not met its burden of proving its acquisitions of master tapes are within the same class as the acquisition of movies by movie studios. First, Capitol acquires original master tapes from independent producers by *purchase*; the statutory exemption for movies is based on *lease* transactions. (See § 6010, subd. (e)(1).) Consequently, the legislative classification[21] is justified by fundamental differences in the economic transactions by which movies, on the one hand, and master tapes, on the other, get from producers to others.

In evaluating whether the Legislature has acted arbitrarily in classifying a *lease* of a motion picture differently from a *purchase* of a master tape, we are mindful that these sorts of differences (between leases and sales) are at the very heart of the tax laws. Not every transfer of property from one to another is subject to sales or use tax; the Legislature has imposed these taxes only on certain economic transactions, to wit, retail sales, purchases, or leases. (See §§ 6006, 6006.1, 6007; 6051, 6201; *Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 734-735 [57 Cal.Rptr. 1022].) Indeed, the Legislature did not even tax lease transactions before 1965, except that sales tax was imposed where goods were rented or leased in lieu of a sale. (See *Universal Eng. Co.* v. *Bd. of Equalization* (1953) 118 Cal.App.2d 36, 41 [256 P.2d 1059].) We conclude that Capitol, which *purchases* its original master tapes, has not proved it is within the same class as movie studios that *lease* movies.[22]

---

[21]Board ruling No. 19, which predated enactment of sections 6006, subdivision (g)(1) and 6010, subdivision (e)(1), was premised on the same distinction: the absence of a "sale" or "purchase" when movie producers transferred rights to studios. (See discussion *ante,* p. 597.)

[22]At trial, one of Capitols' own experts, an attorney with long experience in the movie industry, testified it was the custom in the movie industry for independent film producers to retain the rights to the story of the film when distribution rights were acquired by a studio. The expert testified that in "the great bulk of cases" the economic transaction between film producer and major studio is one in which the studio finances the making of the movie in exchange for distribution rights but that no sale of the film to the studio occurs.

A second reason why the Legislature's classification must be upheld is that Capitol has not proved that movies and master sound tapes are functionally the same things. Evidence at trial indicated a master sound tape is made of one-quarter inch magnetic tape and is immediately useful as a kind of mold or "printing plate," as *Simplicity Pattern* noted. (*Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 909.) Although movies generally have soundtracks, which are physically separate from the visual film component of the movie, the soundtrack is recorded on 35 millimeter sprocketed magnetic tape, synchronized with the film. There was no evidence at trial indicating that a film soundtrack was immediately useful (without editing, mixing, or transfer to another form of tape) for the production of commercial tapes or records for sale to the public.[23] A film soundtrack is not useful as a mold or "printing plate," and the Legislature and the Board can reasonably distinguish between soundtracks and master tapes on that basis, i.e., that additional work must be done on the sound components of movies in order to make them useful for the purpose of producing products for sale to the general public. (See *Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 912.)

Boiled down to its essentials, Capitol, a member of the record industry, is trying to take advantage of a statutory exemption provided for the movie industry. In *Culligan Water Conditioning* v. *State Bd. of Equalization, supra,* 17 Cal.3d 86, the taxpayer made an argument analogous to Capitol's and the Supreme Court disposed of it as follows: "Plaintiff first points out that section 6006, subdivision (g)(2) provides that the Sales and Use Tax Law does not apply to a linen supplier and argues that the 'furnishing of soft water by [plaintiff] to a customer's home is almost identical in nature to the linen supply service.' We do not see how this reference assists plaintiff, since the point plaintiff attempts to make contains its own complete answer, namely that the Legislature has seen fit to provide a statutory ex-

---

[23]Evidence at trial indicated that music for a film is recorded in studios at recording sessions on sprocketed, multiple-track 35 millimeter tape which is then edited and mixed down onto a master music sound tape. That tape is then combined with separately recorded dialogue and sound effects tapes and edited into a master soundtrack tape, which is synchronized with the picture negative. When an independent movie producer delivers a "movie" to a studio, he delivers a photographic picture negative and a soundtrack tape. The soundtrack master tape and the picture negative are physically separate elements which the film studio combines to create an answer print which it copies to release to exhibitors.

A representative of Walt Disney Studios testified that Disney uses the master music sound tape to make phonograph records and tapes. However, Disney is a studio that makes and distributes its own movies. Thus, the availability of the master music sound tape to Disney does not permit the inference that the sound tape, rather than the soundtrack, is generally available to major studios that obtain films from independent producers. Moreover, no evidence suggested that even the master music sound tape was immediately useful, as a "mold" or "printing plate," for the manufacture of records and tapes for sale to the general public.

emption for the linen industry." (*Culligan, supra,* 17 Cal.3d at p. 97, fn. omitted.)

Here, there are sufficient differences between the acquisition and use of master sound tapes and movies to justify different treatment of the record industry and the movie industry by the Legislature.

### III

We have already held that master tapes are tangible personal property for purposes of sales and use tax law. However, Capitol contends license fees paid by and to it for the right to reproduce and market musical recordings are payments for intangible rights and are not subject to sales and use tax even though the recordings are made from duplicate master tapes supplied in conjunction with the licensing agreements. The argument is premised on the technological possibility of using previously manufactured prerecorded tapes or records to produce a new production master tape ("pirating" in the parlance of the industry) and the theoretical possibility that a licensee would purchase the right to manufacture and distribute the artist's performance and not the copy tape which embodies that performance.

However, the record reveals no such separate purchase of intangible rights. Evidence at trial indicated that licensees obtain duplicate master tapes and the right to manufacture, market and distribute records and tapes made from the duplicate in exchange for payment. For licenses given by Capitol, the payment includes amounts attributable to the cost of the duplicated tape and art work that might go with it (about $35 to $40). At the expiration of the term of the license, the duplicate master tapes must be returned or destroyed.

Substantial evidence supports the trial court's implied finding that the "licenses" are, in fact, leases of master tapes. Section 6006.3 defines "lease" to include a "license." Leases are taxed as continuing sales. (§§ 6006, subd. (a); 6006.1.) The tax measure is "the total amount for which tangible personal property is . . . leased . . . valued in money . . . without any deduction on account of . . . labor or service cost . . . ." (§ 6011, subd. (a); *Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 906.) The Board correctly imposed tax on the total value of the license agreements.[24]

---

[24]It is not clear whether Capitol is contending its right to equal protection of the laws was violated when tax was imposed on its licensing agreements. At trial and on appeal, Capitol's equal protection argument focused on original tapes acquired by Capitol pursuant to type B and C contracts. In a footnote in its brief, Capitol does contend the trial court erroneously

## IV

We have rounded up the usual authorities and have discovered they cannot supply an exemption from tax for Capitol. Although there are superficial similarities between master tapes and movies, they are like the similarities present in certain falcons of the Maltese variety: differences appear as one chips at the surface of each bird. Although a master sound tape may contain the stuff that dreams are made of, it is not a movie for purposes of the sales or use tax.

### DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Sparks, J., concurred.

A petition for a rehearing was denied August 22, 1984, and appellant's petition for a hearing by the Supreme Court was denied September 26, 1984. Bird, C. J., was of the opinion that the petition should be granted.

---

rejected Capitol's equal protection argument because the trial court allegedly "ignored" evidence that Capitol leased copy tapes. (Since Capitol failed to request findings of fact or conclusions of law, it is in no position to assert what the trial court did or did not ignore.) We therefore assume Capitol contends that imposition of tax on its licensing agreements is discriminatory and that there is no reasonable basis for exemptions provided the movie industry. Since Capitol raised the issue in a footnote, we dispose of it in one.

Capitol has not shown that the Legislature has arbitrarily discriminated between motion picture leases and copy tape licenses. Evidence at trial indicated that major studios commonly acquired motion pictures from independent producers pursuant to an agreement calling for the financing and distribution of the film. Assuming arguendo that the financing/distribution agreements are "leases," Capitol has not shown any similarity (not to mention identity) between its licensing agreements and the "leases" applicable to the movie industry. Indeed, the trial court had no evidence on which to make such a comparison. Although witnesses testified generally that major studios acquired movies from independent producers pursuant to financing/distribution agreements, only one such agreement was admitted in evidence, and no evidence indicated that the agreement was standard in the industry.

In addition, as we have pointed out, evidence at trial did not establish that movies and master sound tapes are functionally the same.