[No. B067607. Second Dist., Div. Two. Oct. 6, 1993.]

GREAT-WEST LIFE ASSURANCE COMPANY, Plaintiff and Appellant,
v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

1554

## COUNSEL

Barger & Wolen, J. Russell Stedman, Linda R. Caruso and W. Kay Adam for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Herbert A. Levin, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

NOTT, J.—The Great-West Life Assurance Company appeals from the judgment entered against it in two consolidated actions brought to recover refunds of taxes paid to respondent, the State Board of Equalization (the Board). (Rev. & Tax. Code, § 13103.) We modify and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

#### (1) *Introduction and Procedural History*

Each insurer in California is required to pay a tax on the gross premiums it receives each year. (Cal. Const., art. XIII, § 28 [former § 14-4/5]; Rev. & Tax. Code, §§ 12221, 12202, 12202.1.) Appellant is an insurance company which issues, inter alia, certain employee benefit policies in California.

Beginning in October 1981, the Board issued a series of deficiency assessments against appellant for underpayments of taxes on its gross premiums for the tax years 1978 to 1987.

Appellant paid the disputed amounts, then filed petitions for refund, the first of which the Board denied at a public hearing on December 8, 1988. Appellant then filed suit in superior court for refunds of the approximately $6 million it had paid, claiming that it had been denied equal protection by the Board's ruling.[1] Following a court trial on stipulated facts, the superior court found that appellant was denied equal protection but was not entitled to a refund. Appellant appeals from the judgment that it take nothing by its complaints for refunds.

#### (2) *The Metropolitan Decision*

The deficiency assessments were issued against appellant pursuant to a recent Supreme Court decision, *Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649 [186 Cal.Rptr. 578, 652 P.2d 426]. That case involved the taxability of Metropolitan Life Insurance Company's "Mini-Met" employee medical benefit plan, offered as an option to its standard coverage plan. The Mini-Met plan essentially allowed the employer-policyholder to pay employee claims up to a certain point (the trigger point), thereby reducing the amount of actual premiums paid to Metropolitan. The court held this arrangement did not necessarily result in a reduced

---

[1]Appellant filed two lawsuits, case Nos. C734834 and CBC002370. The two cases were subsequently consolidated.

gross premiums tax liability for Metropolitan, and looked beyond the labels designated by the parties, considering the entire insurance arrangement. It found that under the "Mini-Met" plan, the employer-policyholder was not an independent insurer, but functioned as an agent or distributor of funds. (*Id.* at p. 657.) Metropolitan, the insurer, retained control over many aspects of the administration of the plan, including, (1) the determination of benefits to be paid in employee claims, whether or not they were in excess of the predetermined trigger point; (2) the actual disbursement of checks to employees who filed claims; and (3) the assumption of liability for claims which the employer did not pay, whether or not they were in excess of the trigger point. The court then determined that the measure of tax liability was the "total cost of the insurance coverage provided to the insured" and that the pretrigger point claims payments by the employer were to be considered in determining Metropolitan's gross premiums tax liability, along with the actual premiums paid by the employer to Metropolitan. (*Id.* at pp. 661-662.)

Appellant also issued a "minimum premium plan" to various policyholders, similar to that issued by Metropolitan. Pursuant to the *Metropolitan* decision, the Board issued deficiency assessments against appellant based on insurance it provided to its policyholders for which it did not actually receive premiums.

### (3) *The December 8, 1988, Board Hearing*

One of appellant's petitions for refund was considered at a public hearing held by the Board on December 8, 1988. At that hearing, the Board considered a number of petitions from different insurance companies. Several of those petitions involved assessment of gross premiums taxes, following the *Metropolitan* decision, to different types of insurance contracts, including minimum premium plans, administrative services contracts (ASO's), and stop loss contracts. Also at issue were petitions from companies which issued minimum premium plans to Taft-Hartley trusts.[2] Appellant's petition included requests for refunds of taxes imposed on its minimum premium

---

[2]The Taft-Hartley Act (29 U.S.C. § 186 et seq.) which prohibits employers from making any payments to representatives of their employees, permits employers and unions to create employer-financed trusts to fund employee benefits for union employees. (29 U.S.C. § 186(c)(5).) These "Taft-Hartley trusts" are funded by employer contributions, but are operated for the "sole and exclusive benefit" of the employees. The basis for the payment of benefits must be outlined in a detailed written agreement between the union and the employer (29 U.S.C. § 186(c)(5)(B)), the fund must be subject to an annual audit, kept separate from other union welfare funds, and the trustees of the funds are charged with equally representing the interests of the employer and its employees. (29 U.S.C. § 186(c)(5)(B).) (*Ponce v. Const.*

plans, ASO's and stop-loss contracts, but did not involve any plans issued to Taft-Hartley trusts.

Prior to the public hearing, the Board's staff had apparently written recommendations as to each petition, on a case-by-case basis. The Board's members had those recommendations at hand during the hearing and frequently referred to them. Those recommendations, however, are not part of the record and do not appear to have been introduced at trial.[3]

The Board began its consideration of the petitions for refunds of gross premiums taxes on the minimum premium plans with a discussion about the variances between the particular policies at issue and those involved in the *Metropolitan* decision. The staff's review had discovered that the minimum premium plans issued by the various petitioning companies were not identical.

The Board next considered whether ASO's and stop-loss contracts were taxable and found them both to be exempt.[4]

Next, the Board embarked on a protracted discussion of the application of the *Metropolitan* case to both Taft-Hartley trusts, and ERISA plans[5] which did not involve Taft-Hartley trusts. After a motion was made to grant refunds as to those portions of petitions involving Taft-Hartley trusts, it was suggested by one Board member that the independent nature of such trusts under federal law essentially prohibits the characterization of them as agents of insurance companies, as in the *Metropolitan* case. The Board focused on the legal fiction created in *Metropolitan*, of the employer as the agent for the

---

*Laborers Pension Trust* (9th Cir. 1980) 628 F.2d 537, 539, 541 [58 A.L.R. Fed. 157]; *NLRB v. Amax Coal Co.* (1981) 453 U.S. 322, 329-330 [69 L.Ed.2d 672, 679-680, 101 S.Ct. 2789, 2791].)

The duties of the Taft-Hartley trustee were discussed at length in *NLRB v. Amax Coal Co., supra.* As the Supreme Court observed, "[T]he legislative history of the [Labor Management Relations Act] confirms that [section 186(c)(5) of the Taft-Hartley Act] was designed to reinforce, not to alter, the long-established duties of a trustee. . . . [¶] The debates on [that section] further reveal Congress' intent to cast employee benefit plans in traditional trust form precisely because fiduciary standards long established in equity would best protect employee beneficiaries. . . . In sum, the duty of the management-appointed trustee of an employee benefit fund under § [186] (c)(5) is directly antithetical to that of an agent of the appointed party." (453 U.S. at pp. 330-332 [69 L.Ed.2d at pp. 681-682].)

[3]Included in the record are what appear to be unsuccessful motions by appellant to compel production of those recommendations as well as other documents relied upon by the Board during the December 8 hearing.

[4]Appellant was not the only company whose petition involved these types of contracts.

[5]The Employee Retirement Income Security Act of 1974, 29 United States Code section 1001 et seq. ERISA is a comprehensive regulatory scheme designed to protect the interest of employees with respect to employer-sponsored benefit plans. (*Provience v. Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249, 253, fn. 1 [209 Cal.Rptr. 276].)

insurer. The Board discussed the impact of the federal decision in *General Motors Corp.* v. *California State Bd. of Equalization* (9th Cir. 1987) 815 F.2d 1305, certiorari denied in 485 U.S. 941 [99 L.Ed.2d 282, 108 S.Ct. 1122] and noted that that case, which held that employee benefit plans could be taxed, did not involve Taft-Hartley trusts. It also considered the impact of *Elfstrom* v. *New York Life Insurance Co.* (1967) 67 Cal.2d 503 [63 Cal.Rptr. 35, 432 P.2d 731], in which the insurance company was held liable for the erroneous exclusion of an employee from a benefit plan. Further discussion ensued about the preemption of federal law over state agency law. The Board then voted to exclude from taxation those portions of minimum premium policies issued to Taft-Hartley trusts.

The Board's decision was summarized in a letter to appellant's counsel. The letter stated, inter alia: "With the exception of arrangements made with Taft-Hartley trusts (discussed below), the Board concluded that claim amounts paid in connection with such three-party arrangements should be utilized in calculating gross premium taxes due pursuant to the *Metropolitan* decision. As you know, the typical three-party arrangement involves an insurance company, an employer/ policyholder, and the insured employees. The minimum premium aspect of these arrangements (usually in the form of a rider added to an existing group health insurance policy between the insurance company and the employer/policyholder) imposes primary liability for claims below a so-called 'trigger-point' on the employer/policyholder while liability above that point is borne by the insurance company. Claim payments may be made by the insurance company or employer through a variety of joint or separate banking arrangements. The insurance company generally retains the final authority as to claim payments and claim settlement and litigation. Viewed as a whole these arrangements show a 'highly entangled, symbiotic relationship' between the employer/policyholder and the insurance company and were found taxable under the rules of the *Metropolitan* case. [¶] When the policyholder is a so-called 'Taft-Hartley trust' established under section 302 of the Labor Management Relations Act of 1974 (29 U.S.C. § 186(c)(5)), the Board concluded that claim payments could not be used as a basis for calculating the gross premiums tax."

### (4) The Trial Court's Judgment

The trial court found, after a submission by the parties on documentary evidence and stipulated facts, that appellant had been denied equal protection because there was no rational basis for differentiating between policies

issued to employers and those issued to Taft-Hartley trusts.[6] The court held, however, that if an exemption of Taft-Hartley trusts is improper, then appellant's remedy is not to seek a refund, but to file an action to compel the Board to impose the same taxes on Taft-Hartley trusts. Accordingly, it ordered that appellant take nothing by its complaints.

## CONTENTIONS ON APPEAL

Appellant contends the trial court erred in finding that it was not entitled to a refund of taxes paid and in finding that the Board's failure to assess the same taxes on Taft-Hartley trusts resulted in a denial of equal protection to appellant, but that appellant was still not entitled to a refund. Appellant contends that since its equal protection rights were violated, its only appropriate remedy is a tax refund. It also claims that even if the refund was properly denied, the Board erred in calculating the interest due on its deficiency assessments.

## DISCUSSION

### (1) *Appellant Was Not Denied Equal Protection*

In determining whether the Board's application of the gross premium taxation statutes violates appellant's equal protection rights under the state and federal Constitutions, we must determine whether the enforcement of the statute bears a rational relationship to a conceivable legitimate state purpose. (*Del Monte* v. *Wilson* (1992) 1 Cal.4th 1009, 1014 [4 Cal.Rptr.2d 826, 824 P.2d 632]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16-17 [95 Cal.Rptr. 329, 485 P.2d 529].)

The taxation statute at issue is fair and impartial on its face. (2) Appellant has the burden of establishing the defense of discriminatory enforcement, i.e., (1) that it has been deliberately singled out on the basis of some invidious criterion, and (2) that the erroneous application of the statute was due to a discriminatory design of the Board. (*People* v. *Superior Court* (*Hartway*) (1977) 19 Cal.3d 338, 348 [138 Cal.Rptr. 66, 562 P.2d 1315]; *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 298 [124 Cal.Rptr. 204, 540 P.2d 44].) " 'It is . . . clear that mere errors of judgment by officials

---

[6]The court noted, in its statement of decision, "It is true that in an ordinary employer-paid policy, the employee has absolutely no control over the administration of the policy, while in a Taft-Hartley trust, the employee does have some minimal and indirect control, in that the employees can elect different union officials who may at the end of the trustee's term, appoint different trustees. For purposes of taxation, this is a distinction without a substantive difference."

will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity.' . . . (*Sunday Lake Iron Co.* v. *Wakefield* (1918) 247 U.S. 350, 352-353 [62 L.Ed. 1154, 1155-1156, 38 S.Ct. 495].) . . . 'The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.' [Citation omitted.]" (*Murgia* v. *Municipal Court, supra,* at p. 297, italics omitted; see *Allegheny Pittsburgh Coal* v. *Webster County* (1989) 488 U.S. 336, 343-344 [102 L.Ed.2d 688, 697, 109 S.Ct. 633, 638].)

 Here, no such intentional discrimination has been shown. A close review of the transcript of the Board's hearing reveals that minimum premium plans issued by a number of insurance companies were considered together and separately from those plans issued to Taft-Hartley trusts. Nothing indicates any unequal treatment of appellant. Moreover, the distinction of the plans issued to Taft-Hartley trusts was made after the Board's staff had reviewed several petitions for refund by different companies, had analyzed them separately and prepared written recommendations for the Board members. The Board members then engaged in protracted discussion of the ramifications of recent California and federal law on the Taft-Hartley trusts, creatures of federal law. There is nothing in the record which would lead us to even suspect that the Taft-Hartley policyholders or their insurers were being singled out for favorable treatment or that the Board's actions were clearly designed to discriminate against those insurers that did not issue minimum premium plans to Taft-Hartley trusts.[7] As the Board suggests, we are faced with, at most, an erroneous application of law by the Board, but certainly not with the type of invidious discrimination against which the equal protection clauses are meant to protect.

 Moreover, as a panel from this division observed in *Times Mirror Co.* v. *City of Los Angeles* (1987) 192 Cal.App.3d 170, 183 [237 Cal.Rptr. 346]: "Neither due process nor equal protection impose a rigid rule of equality in tax legislation. [Citations.]" The state is not bound to tax every member of a class or none. A determination as to what is a sufficient distinction warranting classification for purposes of taxation will not be overturned unless is it palpably arbitrary. (*Capitol Records, Inc.* v. *State Bd. of Equalization* (1984) 158 Cal.App.3d 582, 599-600 [204 Cal.Rptr. 802]

---

[7]In fact, the transcript reveals that those Board members who had financial or personal interests in the various insurance companies which had submitted petitions for refund would repeatedly recuse themselves from voting on matters involving those companies.

[upholding the imposition of sales and use taxes on a record company's purchase of film tapes even though movie studios which leased those tapes were exempt].) "Where 'no specific federal right, apart from equal protection is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.' [Citation.] . . . [¶] Taxes are frequently imposed on a group or class without regard to their responsibility in creating the condition the tax is intended to relieve." (*Leslie's Pool Mart, Inc.* v. *Department of Food & Agriculture* (1990) 223 Cal.App.3d 1524, 1542-1543 [273 Cal.Rptr. 373].) ■ Appellant cannot complain of a denial of equal protection merely because other insurance companies, which issue benefit policies to Taft-Hartley trusts, are paying a lesser amount of taxes. (*Id.* at pp. 1543-1544; see *Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973) 410 U.S. 356 [35 L.Ed.2d 351, 93 S.Ct. 1001].)

In *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195 [237 Cal.Rptr. 206], an equal protection claim was rejected where employers were required by the state to comply with orders not imposed on labor unions. "The incentives on labor and management being dissimilar, the law properly treats them differently." (*Id.* at p. 1215.) Classification of federally created trusts existing solely for the purpose of administering labor union benefit plans separately from employers who administer their own benefit plans is not arbitrary, and we will not overturn the Board's ruling on equal protection grounds. (Cf. *Redwood Empire Publishing Co.* v. *State Bd. of Equalization* (1989) 207 Cal.App.3d 1334, 1343 [255 Cal.Rptr. 514].) Accordingly, we need not discuss appellant's contentions regarding its remedies for an equal protection violation.

### (2) *Interest Rate Applied to the Underpayments*

■ Appellant's final contention is that, assuming the Board's decision to deny it a refund is valid, the Board miscalculated the interest due on its underpayments. In order to determine the interest rate to be applied to appellant's deficiency assessments, one must refer to several provisions of state and federal tax law.

At the time appellant paid the deficiency assessments in 1988 and 1989, Revenue and Taxation Code section 12632 provided that deficiency assessments shall bear interest "at the modified adjusted rate per month or fraction thereof established pursuant to Section 6591.5 from the date on which the amount, or any portion thereof would have been payable if properly reported and assessed until the date of payment." At the time of payment, Revenue

and Taxation Code section 6591.5 provided that the "modified adjusted rate per month, or fraction thereof" is the "adjusted annual rate established pursuant to [Revenue and Taxation Code] section 19269, plus three percentage points," divided by 12.

Section 19269 of the Revenue and Taxation Code provides that " '. . . the adjusted annual rate' . . . shall be determined in accordance with the provisions of Section 6621 of the Internal Revenue Code. . . .'"

Section 6621 of the Internal Revenue Code provides for the determination of interest rates on overpayments and underpayments of taxes. Subdivision (a), entitled "General Rule," defines the underpayment rate as the sum of the federal short-term rate determined under subdivision (b), plus three percentage points. Subdivision (b) defines the "Federal short term rate" as an amount to be calculated by the Secretary of the Treasury.

The parties' dispute centers on the interpretation of the phrase "in accordance with the provisions of Section 6621," contained in Revenue and Taxation Code section 19629. The section does not refer to any specific subdivision of Internal Revenue Code section 6621.

The Board contends, and the trial court agreed, that the applicable interest rate would be the "underpayment rate" as defined by Internal Revenue Code section 6621(a) (i.e., the federal short-term rate plus three percentage points), plus an additional three percentage points. (Rev. & Tax. Code, § 6591.5, subd. (b).)

Appellant argues that the interest rate should be calculated by using the "Federal short term rate" defined in Internal Revenue Code section 6621(b), instead of the "underpayment rate." It is undisputed that if appellant's method of calculation is adopted, appellant would be entitled to a refund of $240,842.

Appellant provides no legislative history supporting its claim. It argues that subsequent amendments to Revenue and Taxation Code section 6591.5 reflect an intent to use the lower federal short-term rate. We find no merit in this contention.

Revenue and Taxation Code section 6591.5, as amended in 1990 and 1991, in fact, clarifies the preexisting ambiguity in its reference to Internal Revenue Code section 6621. It presently reads: "(a)(1) For interest required to be paid to the state upon underpayment of tax to the state, 'modified adjusted rate per annum' means the adjusted annual rate established pursuant

to subdivision (c), plus three percentage points. . . . [¶] (c) The rate established for interest to be paid upon underpayments of tax shall be determined in accordance with the provisions of Section 6621 of the Internal Revenue Code which establish the underpayment rate, except that the determination specified in Section 6621(b) of the Internal Revenue Code shall be modified to be determined semiannually . . . ."

The specific reference to the underpayment rate as opposed to the federal short-term rate confirms the logical reading of the earlier version of the statute. Moreover, the legislative history of the 1990 and 1991 amendments (Stats. 1991, ch. 236 (Sen. Bill No. 180); Stats. 1990, ch. 1528 (Sen. Bill No. 2196)) indicates that the changes were for technical and clarification purposes only. We find nothing which compels a reading of section 6591.5 to refer to anything other than the federal underpayment rate. The tax rate to be applied to appellant's assessments would be, as correctly calculated, three percentage points in excess of that rate. (Rev. & Tax. Code, § 6591.5.)

### DISPOSITION

The judgment is modified to provide that appellant Great-West Life Assurance Company has not been denied equal protection by the Board's actions at the December 8, 1988, hearing, but is affirmed to the extent that it provides that appellant take nothing by its complaints for refund. Respondent is awarded costs on appeal.

Boren, P. J., and Fukuto, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 20, 1994.